UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAUREN FELDESMAN,

Plaintiff,

-against-

INTERSTATE HOTELS LLC,

Defendant.

<u>**OPINION AND ORDER**</u>

16 Civ. 9352 (ER)

<u>Ramos, D.J.:</u>

Lauren Feldesman, a former cocktail server, brings this gender discrimination and retaliation suit under the New York City Human Rights Law ("NYCHRL") against her former employer, Interstate Hotels LLC ("Interstate"). Interstate moves for summary judgment. For the reasons set forth below, Interstate's motion is DENIED.

I.       **Background**

Interstate manages the Roosevelt Hotel in Midtown Manhattan ("the Hotel"), as well as all of the food outlets at the Hotel, including a rooftop bar and lounge called Mad46. Doc. 52, 1. Both Interstate and the Hotel have policies in place that prohibit sexual harassment in the workplace and further prohibit retaliation against any employees who file complaints or participate in investigations regarding sexual harassment. *Id.* at 1–2. The policies require Interstate and the Hotel to investigate complaints of harassment promptly and take appropriate remedial action against any individual found to have violated the sexual harassment policy. *Id.* at 2.

Mad46 is open seasonally, from approximately mid-April to mid-October every year. *Id.*
Interstate hired Feldesman to work as a cocktail server at Mad46 in 2012, and she worked there
every season until her termination in 2016. *Id.*

Interstate hired Tristan Prescott in 2008 as a bartender at Mad46, and he has worked at
Mad46 every season since then. *Id.* at 2. Since at least 2012, Prescott has worked as a "public,"
or customer-facing, bartender, and at no time did he have supervisory or managerial authority
over Feldesman. *Id.* at 2. From 2014 through Feldesman's termination in 2016, Keith Riker
served as Director of Lounge Operations for Mad46 (reporting to Sean Davidson, Director of
Food and Beverage), in which role he supervised all of the associates that worked at Mad46,
including Feldesman and Prescott. *Id.* at 3.

Feldesman alleged that from 2012 to 2014, Prescott made various comments and engaged
in behavior that she considered sexually harassing. For example, Feldesman testified that
Prescott: commented on the size of her breasts on one occasion in 2012 when she was carrying
several cushions to set up the bar; on several occasions in 2012 and 2013, caused her to drop
cushions she was carrying so he could watch her bend over to pick them up; referred on one
occasion in 2012 or 2013 to her breasts, stating "thank God you have those to get through the
crowd;" asked her on more than one occasion in 2012 and 2013 if her breasts were real; told her
on one occasion in 2013 that it looked like she had lost weight and asked whether that meant her
bra size would be different; said on a daily basis "oh, your legs look really good—in those shoes,
oh . . . —maybe you should get a shorter skirt;" showed her a pornographic video on his
telephone; asked her to rate women customers' appearances; asked her if she "liked it when
people would grab [her] chest;" "bump[ed] into [her] . . . specifically and said, oh, those are
definitely real;" said "anyone who worked at mad46 needed to have big tits in order to work;"

and described a colleague as a "drunk slut" that "just sleeps around." Doc. 48-1, 14–18, 29. By the end of the 2014 season, he was no longer making that type of "really disgusting comments" to Feldesman but she testified that he continued to make sexual comments into 2014 and that she was "sure he definitely made at least one" because she remembered telling a romantic partner that one of her colleagues "was making [her] uncomfortable." Doc. 48-1, 17, 30.

Feldesman also testified that "he didn't like that I was good at my job and that I was a woman." *Id.* at 28. She further testified that he did not like her as a woman "[b]ecause I stood up to him and because . . . I didn't just listen to whatever he wanted to do . . . and I reported him." *Id.*

Feldesman did note that she had seen Prescott speak aggressively with male staff as well, such as Luis Pena and Juan Rijo but that "it's certainly not the same way it is with female staff." Doc. 48-1, 42. Specifically, she testified that he treats men differently with "[h]is tone of voice, his distance from the person he's engaging with, [and] his gestures." *Id.*

Feldesman testified that her managers and colleagues had witnessed the interactions described above. *Id.* at 15–18. Feldesman initially reported these comments to her managers through oral—but not written—communications. *Id.* at 19. Feldesman did not initially make a written complaint because "it was really humiliating to have to write down that." *Id.* at 48. In one instance, when she reported one of Prescott's comments to her manager, David Hakim, he "just shrugged it off" and at the time he laughed. Doc. 44-3, 13–14.

Jessyka Dennis, another cocktail server at Mad46, testified that Prescott had made similarly degrading and sexist comments to her or in her presence. For example, he had spanked her and another female colleague at a holiday party for Mad46 staff in 2008; responded to a complaint in 2014 that a Mad46 customer had inappropriately touched a female server by saying

"was it anything like the end of the season party;" spanked another female colleague in 2011; took a female colleague's telephone without her consent to obtain the telephone number of one of her female friends; asked Feldesman whether she was satisfied with her boyfriend and "what he was like in bed;" told an employee that "she needed to have a breast augmentation in order to stay on as staff;" asked a female colleague about her bra size; physically assaulted a female colleague outside of work; attempted to sexually assault another female colleague outside of work in 2011; told a female colleague that her legs were defined and asked whether her boyfriend "satisfied her;" asked her to rate women customers "in terms of hotness;" asked her to be his "wing woman;" referred to a colleague as a "fucking bitch;" and announced that he had had sex with a female customer and that she was "really big and wild."  Doc. 48-2, 11–12, 22–28

Mee-Lai Bales, another cocktail server at Mad46, testified that between 2009 and 2015 Prescott "always" leered at her and complimented her on her hair and legs.  Doc. 48-3, 9.  He would also frequently propose to take her out and ask her to give him a kiss.  Bales testified, "those comments were made between '09 and 2015, probably like three to four times a week." Doc. 48-3, 10.  She also described him as physically aggressive; he would get to close to her and was "free with his hands" by "touch[ing] [women colleagues] on their arm[s]."  *id.* at 9.

On July 17, 2015, Feldesman emailed Sean Davidson, Keith Riker, and Elizabeth Ortiz, to report that Prescott had "confronted [her] in the service bar," "screamed in [her] face very inappropriately," and "provoke[ed]" her.  Doc. 44-13.  She further stated, "I cannot continue working in this environment of harassment and abuse. . . . I am feeling extremely threatened in my job."  *Id.*  In a July 24, 2015 email sent to the same people, Feldesman complained that Prescot had "set [her] up" by encouraging his friends to complain about her service and by accusing her of stealing bottled beer from the bar.  Doc. 44-14, 2.

In response to Feldesman's complaints, Hotel management, together with human resources, first met with Feldesman alone to better understand her concerns, and then, on July 30, 2015, convened a meeting with Feldesman and Prescott at the same time.  Doc. 52, 7.[1] During the meeting, Feldesman "felt very uncomfortable" because Prescott "refused to even sit down," and instead, "walked around the table yelling at the top of his lungs and flailing his arms."  Doc. 48-1, 63.  According to Riker's account of the meeting, Prescott accused Feldesman of engaging in improper tipping practices.  Doc. 44-6, 27–32.  At the conclusion of the meeting, Chris Hosmer, then the General Manager of the Hotel, instructed both Feldesman and Prescott to make efforts to be civil and co-exist with one another at work without escalating issues.  Doc. 52, 8.

Despite the meeting and Hosmer's instruction, the disputes between Feldesman and Prescott continued.  Feldesman complained that Prescott would engage in provocative conduct like sending customers into her section to "make a problem," and serving Feldesman's table customers in an effort to earn more money for himself.  He also referred to her and her fellow servers as "thieves" and implied that she was not good at her job.  Feldesman also accused Prescott of violating bar procedures by enforcing a non-existent two-drink minimum.  Doc. 48-1, 36, 20, 40, 41.

On September 16, 2015, Feldesman sent an email to Keith Riker and Sean Davidson to inform them that Prescott "has continued to be incredibly hostile, discriminatory, threatening, and aggressive especially towards the female associates."  She also advised that Prescott had received complaints from two other female associates, and "had instances of actual violence

---

[1] According to the meeting notes, Chris Hosmer, Keith Riker, James Davidson, Milagros Vega, and Sabrina Ali were all present at this meeting.  Doc. 44-16.

against women in his personal life and with several people I know." Doc. 53-5. She further complained that management had done "NOTHING" about his "crazy antics." Doc. 53-5.

In September 2015, a number of other employees complained in writing about Prescott's behavior, including Jessyka Dennis, Mee-Lai Bales, Christopher Hall, Ernest Hernandez, and Shauna Tuso. Docs. 44-26, 44-27, 44-28, 44-29, 44-30, 44-31, 44-32. The complaints fall into three categories. Some Mad46 staffers described a dispute between two bartenders, Prescott and Christopher "Cain" Callendar, and a female server, Hayley Lundquist, during which Callendar and Prescott verbally attacked Lundquist concerning her customer's checks. Doc. 44-30.

Other staffers complained about other specific interactions between Prescott and women who worked with him. For example, Bales wrote in an email to Keith Riker, "As I was in conversation with Chef Juan[,] Tristan came storming into the kitchen yelling about an order for a pizza" and that when Bales attempted to remedy the situation, Prescott "began screaming in [her] face" and telling her to "mind your business." Doc. 44-27. Similarly, Tuso wrote Keith Riker that she received multiple complaints from two female service staffers regarding interactions between them and Prescott and that when she confronted him "he immediately got defensive and quickly accused [the female staffers] of 'not doing their job.'" Doc. 44-32.

Dennis complained about Prescott in a more general way. In a September 2, 2015 email to Milagros Vega, an employee in Interstate's human resources office, she wrote, "I have seen Tristan be intimidating and bully other people in mad46 (always female employees, interestingly)." Doc. 44-26. In an email sent to Keith Riker and Sean Davidson, Dennis asked "if it is possible for human resources to look into the matter of harassment brought against Tristan" because she noticed him becoming "increasingly more aggressive and even violent with

employees (mostly female employees) of the hotel" and asserted that he "has physically assaulted two [female] Mad46 employees off hotel grounds."  Doc. 44-31.

## A.      Keith Riker Investigation

In September 2015, Keith Riker conducted an investigation into the conflicts between Feldesman and Prescott, and between Prescott.[2]  Doc. 44-5, 35–38.  As part of his investigation, Riker spoke to Sal Duplessis, Ricard F., Ernest Hernandez, Fernando Solier, Callendar, and Christian Madeira.  Doc. 44-6, 42–43.  According to Riker's notes of these interviews, the employees accused Feldesman of, among other things, acting rudely to customers, moving guests from the bar to the table without asking Prescott, claiming harassment, and stealing.  *Id.*  The same employees described Prescott as argumentative, difficult, condescending, and interested in firing Feldesman.  *Id.*  They also described the conflict as representative of a hostile work environment.  *Id.*  In October 2015, Feldesman followed up with Riker and Interstate's human resources department regarding Riker's investigation.  Doc. 52, 13.  At this time Mad46 was about to close for the season, at which point all the employees were placed on temporary lay-off until the next spring, and so no further action was taken.  *Id.*

## B.      Simone Noe Investigation

Soon after Mad46 reopened in the spring of 2016, Feldesman again contacted Riker and human resources regarding her complaint against Prescott.  Doc. 44-36.  In response, Simone Noe, recently hired as a director of a human resources task force, was directed to look into the

---

[2] Riker did not consider the investigation to concern gender discrimination.  In response to the deposition question, "Did you look into the fact that Ms. Feldesman and Ms. Dennis had made complaints that Tristan Prescott was treating the females differently?" Riker responded, "No.  It had nothing to do with females."  Doc. 44-6, 38.  *See also id.* at 39 ("Q.  Did you look into whether or not Tristan Prescott was engaging in gender discrimination?  A. It did not have to do with gender discrimination.").

complaints. Doc. 44-38. As part of her investigation Noe interviewed Feldesman and several other staffers. Doc. 44-39, 8–27. She conducted her first interview on May 26, 2016. *Id.* at 8.

Each person interviewed, according to Noe's notes, provided different accounts of the dynamic. Feldesman, Hernandez, Pena, Bales, and Rijo described Prescott as the aggressor, emphasizing that he screamed at his colleagues, spat in one female colleague's face, and pushed others, all to intimidate them. Doc. 44-39, 8, 11–12, 19–24

Callendar and Sonnad, both bartenders, portrayed Feldesman as the aggressor by saying that Feldesman is "bitchy," "very hard to work with," and that she "starts it," "steals our money," threw a glass at a colleague, and verbally abused others. *Id.* at 15–16, 25–26. Callendar and Sonnad also cast Prescott's alleged behavior in a more positive light by saying that he "gets animated, not threatening," and that he yells at people "[n]ot with I hate you but just more like please do the right thing." *Id.*

Dubois, a cocktail server, and Duplessis, a security guard, thought that they were equally responsible, remarking that "[t]hey are always trying to pit people against each other," *id.* at 9–10, and that "it goes both ways," *id.* at 17–18.

On June 22, 2016, Noe wrote Feldesman a letter to inform her that "Based upon the investigation, we could not substantiate the allegations of violations of the Workplace Violence or Sexual Harassment policy." Doc. 44-43. After receiving the letter, Feldesman wrote Noe an email to contest her methods and to question her impartiality. Doc. 44-44, 6. Specifically, she stated that Noe had "neglected to properly interview and call every person involved" and that her "handling of this case has been highly unethical and unprofessional." *Id.*

## C.      Dress Incident

Shortly before Noe concluded her investigation, she asked Feldesman to come to the human resources office to try on a new uniform. Doc. 48-1, 70. Feldesman asked her union delegate, Kofi Bentil, to accompany her. Feldesman went into the human resources' bathroom, tried it on, discovered that it did not fit, and returned to the lobby of the office in the clothes that she had worn to work that day. *Id.* at 71. She said that the uniform did not cover her, so she was not going to "walk out . . . half-naked in front of the 10 to 15 people that were in the lobby." *Id.* Noe told her that she had to wear the uniform and that she would suspend her if she did not. *Id.* Feldesman relented, put on the uniform, and stood in the lobby for approximately 30 seconds while Noe, two union representatives, and the Executive Housekeeper examined how the uniform fit her. *Id.* at 72. According to Feldesman, because no tailor was present, Noe must have forced her to come out "exposed" only to humiliate her. *Id.* According to a later investigation, the Executive Housekeeper was there to determine what needed to be adjusted, so that she could direct a tailor whom she supervised. *Id.* at 8. In her deposition, Noe testified, "The purpose was she needed to be fitted so that she could be in uniform. If she refused to be fitted, then she would be sent home or suspended." Doc. 48-5, 42.

Feldesman reported the incident in a series of emails sent to Noe, the director of human resources, another Interstate employee, and two union representatives. Doc. 44-44, 2–6. Noe forwarded the emails to Jane Blake, the chief human resources officer, and Jaime Novikoff, the corporate director of employee and labor relations. *Id.* at 2.

## D.      Knife Incident

On June 30, 2016, Feldesman wrote Jaime Novikoff and told her that "I was just given some game changing information regarding" Prescott and that "I'd like to update you as soon as

possible." Doc. 53-30, 2. Later that day, she emailed Novikoff a criminal background check that allegedly revealed Prescott's past name and his criminal history. Doc. 53-31. Shortly after she sent that email, Feldesman testified that she saw Prescott in the kitchen and he said, "you're fucking done" while "he was holding the knife in a menacing way." Doc. 48-1, 21. Feldesman reported the incident to Riker and Riker said, "you can use my phone in my office, and he pretty much laughed in [her] face." Doc. 48-1, 73. She then called the police from her cellular telephone because, according to Feldesman, he had threatened her and held a weapon in front of her in "a menacing way." *Id.* at 74. Five police officers responded and told Mad46's managers that Feldesman had reported Prescott. Doc. 48-4, 230. They left without making any arrests. *Id.* The following day, Feldesman emailed Novikoff to report the incident. Doc. 53-33.

Shortly thereafter, Novikoff requested a background check of Prescott. The investigator that performed the background check reported back that, "As you can tell from the preliminary information provided there are serious character issues which must be explored." Doc. 48-6, 57.

When confronted, Prescott told Blake that he changed his name because he was an actor. Doc. 48-7, 31. On July 5, Interstate suspended both Prescott and Feldesman with pay pending the completion of the investigation regarding alleged workplace violence and harassment. Docs. 58-2, 53-40.

On July 6 and 7, Novikoff also sent James Murphy a copy of a criminal complaint filed against Prescott under his former name. Doc. 48-6, 62.

**E.      Jaime Novikoff Investigation**

Around the same time and in response to Feldesman's request for another investigation, Interstate assigned a different employee, Novikoff, to perform an investigation into Feldesman's complaint against Prescott. Doc. 44-44, 2; Doc. 48-6, 13. Novikoff reviewed Noe's notes and

interviewed additional employees that had been suggested by Feldesman.  Doc. 48-6, 17.  Noe

helped organize the interviews but she did not participate in or direct them.  *Id.* at 18.  Novikoff

"reach[ed] [her] own conclusions."  *Id.*

Novikoff's investigation ran from late June through early July 2016, during which she

spoke to the following people:  Feldesman, Prescott, Dennis, J.R., Fernando Solier, Riker,

Callendar, Sonnad, Lundquist, Ali, Noe, and Hernandez.  Doc. 53-41, 3–4.  Additionally, she

reviewed Prescott's criminal history and email statements provided by Bales and DuBois.  *Id.*

As was the case with Noe's report, Novikoff's investigation captured the employees'

different understandings of the dispute between Feldesman and Prescott.  Feldesman,[3] Dennis,

Bales, Solier, and J.R. characterized Prescott as violent, aggressive, and intimidating.  *Id.* at 4.

Prescott, Callendar, Dubois, and Sonnad placed the blame on Feldesman and described her as "a

problem," "aggressive," a bully, and "difficult to work with."  *Id.* at 5.  Lundquist questioned

Feldesman's motive for initiating the harassment complaint by alleging that she brought the

claim because "the bartenders know about the fact that the three servers are 'tip fluffing.'"  *Id.* at

6.  Hernandez and Riker took a more neutral stance.  Hernandez stated that "[Prescott] and

[Feldesman] argue back and forth with each other," *id.*, and Riker said that he "has never seen

any of the alleged screaming or physical contact between [Prescott] and [Feldesman] or

[Prescott] and any other associates."  *Id.*  at 4–5.

In her findings and recommendations, Novikoff noted that there appeared to be "a clear

division" between three groups:  the three unionized servers (Feldesman, Bales, and Dennis), the

---

[3] Feldesman testified that during her interview with Novikoff, "I tried to speak with her about the course of everything going on, but she only wanted to know what had just happened the night before [when the police were called] and . . . when I tried to like give her this like long overview, she didn't—she shut—she really shut me down, she was not interested."  Doc. 48-1, 61.  Feldesman "didn't feel like [she] could speak freely . . . because she kept cutting [her] off."  *Id.* at 62.

bartenders (Prescott, Callendar, and Sonnad), and the non-union servers (Lundquist and Dubois). *Id.* at 8. She explained that, while Feldman and other severs claimed harassing behavior by Prescott, the bartenders and non-union servers complained about harassment by the union servers, Feldesman, Bales, and Dennis. She also reported that employees claimed that Feldesman made a false police report in order to get Prescott fired because she was upset about a tip incident. *Id.* However, because of "credibility issues," Novikoff was unable to substantiate any of the allegations of unlawful harassment by Prescott and recommended that the hotel review Interstate's Prohibited Harassment policy with all staff members at Mad46 and that the hotel provide additional training. *Id.* She further concluded that, in reference to the dress incident, Feldesman "was never placed in a position where she was forced to expose herself." *Id.* at 9.

F.     **Tip Fraud Investigation**

As a result of the allegations regarding improper tipping practices, Interstate launched a separate investigation into those claims. Doc. 52, 24.

Interstate had a written policy prohibiting the fraudulent alteration of guest checks. An automatic gratuity of 18% could be added to parties with five or more guests. Bartenders Callendar and Sonnad and server Lundquist told Novikoff that Feldesman, Dennis, and Bales had added this automatic gratuity without authorization. Callender explained that Feldesman, Dennis, and Bales used a button to add a tip of 15-20% to the checks which the guests would not see as a separate item, resulting in the guests adding a second tip unknowingly. Sonnad also confirmed that Feldesman, Dennis, and Bales used a button to put a tip into a customer's check without management approval, as reported to Novikoff by the non-union servers. Similarly, Lundquist told Novikoff that she overheard Bales and Feldesman referring to "double tips" or "doubles" and observed Bales, Feldesman, and Dennis adding tips to the checks by pressing a

button that allows a gratuity to be added before presentation to the guest and without a manager's swipe. *Id.* at 26.

During her deposition, Dennis claimed that Riker "told Bianca DuBois to instruct me to use [the gratuity adding button] in his absence." Doc. 48-2, 48. Dennis also testified that Riker "had made [the gratuity button] available to us so that we can use it in his presence—or in his absence" and that she remembered one instance in which Feldesman used it in his presence without repercussion. *Id.*

As a result, Novikoff asked the accounting department at the Hotel to review all of the receipts from the beginning of the season to see if others had used this button to add automatic gratuity to customers' bills. Doc. 48-6, 72. She never specified which employees she believed had used this button and she asked for "a full audit of all of the receipts." Doc. 48-6, 72. The investigation included the risk management team, the accounting team, the general counsel, and others. Doc. 48-6, 72. However, only the accounting team reviewed the receipts and they only reviewed receipts that included both an automatic gratuity and an additional tip amount added by the customer. Doc. 48-6, 72. With respect to the receipts that met those specifications, the automatic tip "was usually approximately, and often exactly, 20%," and each of those checks were only handled by Feldesman, Dennis, or Bales. Doc. 44-10, 5.[4] Noe estimated that they reviewed "somewhere between 20 and 50" checks. Doc. 48-5, 49.

## G. Discharge Decisions

Interstate terminated Feldesman, Dennis, and Bales on July 14, 2016, for violating tip and gratuity policies. Doc. 42, 30. During the termination meetings, Interstate handed each of the servers a Counseling/Disciplinary Record that set forth in writing the grounds for termination:

---

[4] Feldesman has pointed to evidence that Dubois, another staffer, had also violated this alleged policy. Doc. 53-45.

"A review of MAD46 gratuity transactions reveals that you manipulated the Hotel's POS system for personal gain and fraudulently altered guest checks by adding a gratuity to the total amount of the checks without management approval." Docs. 44-71, 44-72, 44-73. Feldesman claims that at the termination meeting they did not provide anything for her to review and did not allow her to speak. Doc. 48-1, 88.

On September 1, 2016, all Mad46 employees, including Prescott attended a harassment training presented by Interstate's outside counsel. Doc. 52, 22.

## H.    Procedural History

On December 5, 2016, Feldesman, Dennis, and Bales initiated the instant action against Interstate for gender discrimination and retaliation in violation of the NYCHRL. Doc. 1. Bales voluntarily dismissed her claims on June 16, 2017. Doc. 21. Dennis settled her claims on May 24, 2018. Doc. 44, 2. Interstate moves for summary judgment on Feldesman's claims. Doc. 42.

In opposition to Interstate's motion for summary judgment, Feldesman attaches affidavits from Nana Dooreck, Amanda Holt, and Gabriella Rubino, women who also worked as cocktail servers at Interstate.

In her affidavit, Dooreck declared that, during the 2008, 2009, 2010, and 2011 seasons, Prescott "relentlessly" asked her out, and asked her "in front of customers – to make out" with another woman. Doc. 49. Doorek states that Prescott asked her whether her vagina was slanted and "was very comfortable discussing sexual things, like his sex life and our appearance in the workplace." *Id.* She also said that Prescott would scream in the faces of female colleagues. *Id.*

Amanda Holt testified that during the 2012, 2013, and 2014 seasons Prescott would make sexual comments, including asking why the two had "never made out" and telling her that "he was really good at going down on girls." Doc. 50. He also asked if they could have sex before

the summer was over and told her that she looked "very fertile." *Id.* She also complained that he "would get in [her] face and yell at [her]." *Id.*

Gabriella Rubino declared that, during the 2014 season, Prescott would leer at her, say "oh God, you look good," tell her, "You clean up nice," and describe her as "sexy." Doc. 51. He also "made frequent comments about her legs and what [she] was wearing." *Id.*

Dooreck and Rubino also declared that the cocktail servers were authorized to apply the automatic gratuity to customers' bills. Docs. 49, 51.

## II.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

## III.    Discussion

Interstate moves for summary judgment on Feldesman's hostile work environment and retaliation claims. Feldesman brings these claims pursuant to the NYCHRL.

## A.    Hostile Work Environment

The NYCHRL provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of . . . gender . . . [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment."  New York City, N.Y., Code § 8-107(1)(a).  For liability under this provision, "the primary issue for a trier of fact in harassment cases, as in other terms and conditions cases, is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender."  *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 74 (N.Y. App. Div. 2009).  Furthermore, "[a]t the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred."  *Id.* at 78.

Defendants, however, "can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'"  *Id.* at 80.  Under this standard, "summary judgment will still be available where [defendants] can prove that the alleged discriminatory conduct in question does not represent a 'borderline' situation but one that could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences."  *Id.*

An employer may only be held liable for its employee's behavior under this section if "[t]he employer knew of the employee's . . . discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action . . . ."  New York City, N.Y., Code § 8-107(13)(b).  For the purposes of this provision, "an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was

known by another employee or agent who exercised managerial or supervisory responsibility." *Id.*

Generally, the statute of limitations for a claim brought under the NYCHRL is three years. *Herrington v. Metro-N. Commuter R. Co.*, 118 A.D.3d 544 (N.Y. App. Div. 2014). However, a court may consider comments made and actions taken before the statute of limitations if the plaintiff "allege[s] facts comprising a single continuing pattern of unlawful conduct extending into the [limitations] period immediately preceding the filing of the complaint." *Id.* (internal quotation marks and citations omitted).

In light of these principles, the Court must address four questions to resolve the pending motion. First, has Feldesman alleged facts that Prescott treated her less well because of her gender in the three years before she filed her complaint, that is, on or after December 5, 2013? Second, if so, has she also alleged facts that Prescott treated her less well because of her gender more than three years before she filed her complaint and do these two groups of facts "compris[e] a single continuing pattern?" Third, did these comments or actions amount to more than just petty slights and trivial inconveniences? Fourth, and finally, may the Court hold Interstate responsible for this unlawful conduct?

## 1. Gender-Based Treatment within the Statute of Limitations

As indicated above, Feldesman must show that Prescott treated her less well than other employees because of her gender. *Williams*, 61 A.D.3d at 78. The NYCHRL provides that "discrimination shall play *no* role in decisions relating to employment." *Id.* at 78 n. 27 (emphasis added). As a result, "the question on summary judgment is whether there exist triable issues of fact that discrimination was *one* of the motivating factors for the defendant's conduct," *id.* at 78, and a defendant "is entitled to summary judgment on this basis only if the record

establishes as a matter of law that discrimination play[ed] *no* role in its actions." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (internal quotation marks omitted). Interstate argues that Prescott did not treat Feldesman less well than her colleagues because of her gender.[5]

Interstate argues that there is no evidence that Prescott made sexual comments to Feldesman within the statutory period and points to Feldesman' testimony that by the end of the 2014 season, "he wasn't . . . making all of these . . . really disgusting comments." However, there is more than sufficient evidence that Prescott's gender-based comments and discriminatory actions continued into 2014. Feldesman testified that Prescott continued to make sexual comments into 2014 and that she was "sure he definitely made at least one" because she remembered telling a romantic partner at the time that one of her colleagues "was making [her] uncomfortable." Doc. 48-1, 17, 30. Moreover, Bales testified, "those comments were made between '09 and 2015, probably like three to four times a week." Doc. 48-3, 10. *See also* Doc. 51 (Gabriella Rubino, who began working for Interstate in 2014, stating in her affidavit that Prescott would frequently leer at her, say "oh God, you look good," tell her, "You clean up nice," describe her as "sexy," compliment her legs, and comment on her outfits).

Interstate also asserts that the evidence establishes that struggles about money, authority, and bar procedures motivated the comments made by Prescott. Doc. 43, 9–11. Feldesman argues that Prescott sought to undermine her ability to make money and gain power precisely because he did not want a woman to surpass him. Doc. 54, 19. Indeed, Feldesman testified that

---

[5] Interstate also asserts that Noe, in ordering Feldesman to try on a uniform in front of her colleagues, did not treat her less well than her colleagues because of her gender. Specifically, Interstate argues that Noe asked her to try on her uniform because she had refused to wear it and because one of the people present could measure the dress to determine how to alter it so that it properly fit Feldesman. Doc. 43, 17. Feldesman has not contested this point and instead references this event to question Noe's impartiality. Doc. 54, 23.

"he didn't like that I was good at my job and that I was a woman;" and that he did not like her as a woman "[b]ecause I stood up to him and because . . . I didn't just listen to whatever he wanted to do." Doc. 48-1, 28.

Feldesman further claims that the Court should view these facially sex-neutral disputes in light of Prescott's sex-based comments because the Second Circuit has held that, in the Title VII context, "[f]acially neutral incidents may be included, of course, among the totality of the circumstances that courts consider in any hostile work environment claim" as long as there is "some circumstantial [evidence] or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002) (internal quotation marks omitted). *See also Raniola v. Bratton*, 243 F.3d 610, 622 (2d Cir. 2001) (finding that "[b]y virtue of the sex-based comments made" earlier, "a reasonable jury could infer that the other abuse [plaintiff] suffered was also on account of sex" because "[w]e have held that prior derogatory comments by a co-worker may permit an inference that further abusive treatment by the same person was motivated by the same sex-bias manifested in the earlier comments."). A triable issue of fact exists as to whether gender-based animus was one of the factors motivating Prescott's actions, even those that seemed, on their face, to be sex-neutral.

Finally, Interstate contends that the evidence establishes that Prescott also acted aggressively towards his male colleagues, such as Juan Rios and Luis Pena. While this may be true, Interstate has not provided any evidence that Prescott subjected male colleagues to sexual comments and Feldesman testified that Prescott treated men differently with "[h]is tone of voice, his distance from the person he's engaging with, [and] his gestures." Doc. 48-1, 4. Moreover, the Second Circuit has held in interpreting Title VII that "especially in the context of a claim of sexual harassment, where state of mind and intent are at issue, the court should not view the

record in piecemeal fashion, and summary judgment should be used sparingly." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 548 (2d Cir. 2010) (internal quotation marks and citations omitted). Furthermore, as Feldesman correctly points out, "[a] jury could simultaneously find that Prescott had a problem with Feldesman because of her gender and had difficulties with other male employees that were unconnected with that bias." Doc. 54, 20.

### 2. Gender-Based Treatment Outside of the Statute of Limitations

Interstate asserts that the Court may not consider Prescott's actions before December 2013 because the continuing violation doctrine does not apply because Feldesman testified that Prescott made fewer sexual comments at the end of the 2014 season than he had in the preceding years. It specifically argues that the continuing violation doctrine should not apply because the actions taken before and after December 2013 are not sufficiently related to be part of the same actionable hostile work environment. *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010). However, as noted above, Feldesman, Bales, and others testified that Prescott's sexual comments continued into 2014. Doc. 54, 13–14.

A hostile work environment develops "over a series of days or perhaps years" although "a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). As a result, "[s]uch claims are based on the cumulative effect of individual acts" and, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 115, 117. In applying this standard, known as the continuing violation doctrine, the Second Circuit has "conclude[d] that [plaintiff's] sworn factual allegations of [her colleague's] constant stream of unjustified criticisms of her work described specific, related instances of harassment adequate to depict a continuity of allegedly unlawful

conduct . . . although the final abusive incident on September 25, 1997, was separated from [her colleague's] final sexual advances by a gap of nearly 2 ½ years." *Fitzgerald v. Henderson*, 251 F.3d 345, 363 (2d Cir. 2001)

Here, Feldesman and her colleagues testified that the same individual, Prescott, made regular sex-based remarks and abusive sex-neutral comments to them before and after December 5, 2013. The Court, therefore, finds that the continuing violation doctrine applies.

### 3.     Severity of Gender-Based Treatment

Interstate argues that even if Prescott treated Feldesman less well because of her gender this treatment did not amount to anything more than petty slights and trivial inconveniences, citing three cases where courts found allegedly more severe behavior insufficient, *Ellis v. City of New York*, No. 08 CV 7605 DAB, 2011 WL 3279057, at *1 (S.D.N.Y. July 28, 2011), *Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 505-506 (S.D.N.Y. 2010), *Hernandez v. Kaisman*, 2011 WL 1821669 (Sup. Ct. N.Y. Cty. Apr. 13, 2011)). Doc. 43, 13–14.

As an initial matter, and as Feldesman argues, these cases are inapposite. In *Ellis* the plaintiff had merely provided evidence that her colleague had, on one occasion, kissed her hand, asked her about her husband's body, and invited her out to dinner. 2011 WL 3279057, at *1. In *Magnoni*, the plaintiff's "case relied almost entirely on her testimony" and the court ruled against the plaintiff after a bench trial—not on summary judgment—because "[t]he Court conclude[d] that [plaintiff] was not a credible witness." 701 F. Supp. 2d at 498. In *Hernandez*, the trial court issued its opinion on summary judgment, but the Appellate Division reversed it on appeal. 2011 WL 1821669. *See Hernandez v. Kaisman*, 103 A.D.3d 106, 115 (N.Y. App. Div. 2012) (reversing the trial court and finding that a reasonable jury could conclude in the plaintiff's favor

even though the claims consisted of only "mildly offensive sexual" emails and "isolated" comments "objectifying women's bodies and exposing them to sexual ridicule").

The First Department has commented that under the NYCHRL "[o]ne can easily imagine a single comment that objectifies women being made in circumstances where that comment would, for example, signal views about the role of women in the workplace and [can] be actionable." *Williams*, 61 A.D.3d at 84 n.30. Moreover, the Second Circuit found that a plaintiff had provided sufficient evidence to take to a jury where male colleagues rated female colleagues' appearance, described a female colleague as sexy, told her that her clothing choices implied that she was promiscuous, regularly shared pornography with her, and asked her to have sex with them. *Mihalik v. Credit Agricole Cheuvreux N.A.*, 715 F.3d 102, 106 (2d Cir. 2013). A reasonable jury may find that the comments and behavior that Feldesman describes here establish that Prescott subjected her and other women at Interstate to more than just petty slights and trivial inconveniences.

### 4. Interstate's Responsibility

Interstate argues that even if Prescott had treated Feldesman less well than her colleagues because of her gender and even if this treatment amounted to more than just petty slights and trivial inconveniences, no jury could find Interstate liable because Prescott was not her supervisor and because Interstate took prudent investigative and corrective action. Doc. 43, 14.

The NYCHRL provides, that an employer may only be held liable for its employee's behavior under this section if "[t]he employer knew of the employee's . . . discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action." New York City, N.Y., Code § 8-107(13)(b). For the purposes of this section, "an employer shall be deemed to have knowledge of an employee's or agent's discriminatory

conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility." *Id.*

As is the case for the NYCHRL, "liability will not attach [in the Title VII context] unless the company failed to take reasonable steps to eliminate the harassment." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998). In determining whether an employer took reasonable steps, the Court must consider "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Id.* As a result, "[i]f the evidence creates an issue of fact as to whether an employer's action is effectively remedial and *prompt,* summary judgment is inappropriate." *Duch v. Jakubek*, 588 F.3d 757, 766 (2d Cir. 2009). The Second Circuit has held that a reasonable jury could conclude that an employer did not take reasonable and prompt action when it waited three months to investigate a complaint of sexual harassment. *Id. See also Kracunas v. Iona Coll.*, 119 F.3d 80, 82 (2d Cir. 1997) (per curiam) (holding that a district court erred in concluding that an employer's response, taken four to six months after the employer learned of the allegations, was appropriate as a matter of law), *abrogated on other grounds by Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1989).

Feldesman testified that Prescott's discriminatory comments towards her began in her first season and that she made Interstate aware of them from the beginning. For example, in 2012, Prescott told her "you're lucky that you have huge tits" and she reported the comment to her manager, David Hakim. Doc. 44-3, 13–14. Hakim, however, according to Feldesman's deposition, "just shrugged it off" and laughed at the time. *Id.* at 14, 16.

On July 17, 2015, Feldesman submitted her first written complaint about Prescott to Sean Davidson, Keith Riker, and Elizabeth Ortiz, to report that Prescott had "screamed in [her] face

very inappropriately," and that she "cannot continue working in this environment of harassment and abuse." Doc. 44-13. A week later, she sent a similar email to the same people. Doc. 44-14, 2. On July 30, 2015, Interstate convened a meeting between Prescott and Feldesman, which Feldesman described as inadequate. She testified that she "felt very uncomfortable" because Prescott "refused to even sit down," and instead, "walked around the table yelling at the top of his lungs and flailing his arms." Doc. 48-1, 63.

On September 18, 2015, Feldesman sent an email to Keith Riker and Sean Davidson to inform them that Prescott "has continued to be incredibly hostile, discriminatory, threatening, and aggressive especially towards the female associates." Doc. 53-5. Soon after receiving this email, Riker began an investigation but conceded in his deposition, that "It had nothing to do with females" and "It did not have to do with gender discrimination." Doc. 44-6, 38, 39. Around May 26, 2016, as a result of Feldesman's protests, Noe opened an investigation into her complaints of harassment. Doc. 44-39, 8.

In light of these facts, a reasonable jury could find that Interstate did not engage in effectively remedial and prompt action because in 2012 its manager, David Hakim, was dismissive when Feldesman first complained about Prescott. Moreover, Feldesman testified that she continued to make such oral complaints and that, in any event, Interstate managers personally observed the comments and interactions about which she complained. Interstate did not take any corrective action until three years later in 2015 after Feldesman had emailed two more written complaints about Prescott to her managers. Moreover, a reasonable jury could also conclude that the 2015 corrective action was not effectively remedial because, according to Feldesman's testimony, the mediation amounted to little more than a shouting match and

because, according to Riker's testimony, his investigation "did not have to do with gender discrimination."

## B.    Retaliation

The NYCHRL provides as follows:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter . . . . [T]he retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.

New York City, N.Y., Code § 8-107(7).

"To establish its entitlement to summary judgment in a retaliation case, a defendant must demonstrate that the plaintiff cannot make out a *prima facie* claim of retaliation or, having offered legitimate, nonretaliatory reasons for the challenged actions, that there exists no triable issue of fact as to whether the defendant's explanations were pretextual." *Brightman v. Prison Health Serv., Inc.*, 108 A.D.3d 739, 740–41 (N.Y. App. Div. 2013). Interstate argues that Feldesman cannot make out a *prima facie* claim of retaliation and, in the alternative, Interstate has offered a legitimate, nonretaliatory reason for its decision and there is no triable issue of fact as to whether its explanations were pretextual.

### 1.    *Prima Facie* Case of Retaliation

To establish a *prima facie* claim of retaliation under the NYCHRL, the plaintiff must establish: (1) she engaged in a protected activity, (2) her employer was aware that she had participated in such activity, (3) her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct. *Brightman*, 108 A.D.3d at 740. In a related context, the Second Circuit has "held that a close temporal relationship between

25

a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation." *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002). *See also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (two months between protected activity and allegedly adverse action were sufficient to establish causation). The parties agree that Feldesman's termination on July 14, 2016, was reasonably likely to deter a person from engaging in protected activity.  Doc. 43, 18.  The debate about Feldesman's *prima facie* case of retaliation centers on one question:  Has Feldesman satisfied the causal prong of the test by providing evidence that she made a protected complaint less than two months before her termination on July 14, 2016?

Interstate claims that Feldesman's 2016 complaints were not protected "because none of her complaints during that season alleged that Prescott was treating her or other associates differently based on gender."  Doc. 43, 19.

In *Treglia*, the Second Circuit held that participation in an investigation amounts to protected activity, even if the plaintiff made the initial complaint that sparked the investigation many months before.  313 F.3d at 721.  Feldesman argues that, under this standard, her participation in Noe's and Novikoff's investigation in June of 2016 concerning violations of the Workplace Violence or *Sexual Harassment policy* was protected activity under NYCRHL's retaliation provision.  Doc. 44-43.  Feldesman further claims that, in light of her many complaints about Prescott, her call to the police on June 30, 2016, also qualified as protected activity under the Court of Appeals' holding that courts must construe complaints "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Albunio*, 947 N.E.2d at 137.

The Court finds that her active participation in the investigation into her sexual harassment complaint, and her calling of the police on her alleged harasser were protected activities. *See McGuinness v. Concentric Health Care LLC*, 116 A.D.3d 527, 529 (N.Y. App. Div. 2014) (finding that "issues of fact exist as to whether plaintiff's letter constitutes a complaint about . . . bias and was therefore a protected activity" even though the plaintiff's written complaint did not mention the word discrimination); *Mihalik*, 715 F.3d at 115 (holding that a plaintiff had engaged in protected activity when she asked her colleague "What's not working out? Me and you or me at the company?" in a meeting where she learned of her termination after she had previously rejected his sexual requests).

## 2. Pretext

Interstate argues that, even if Feldesman has made a *prima facie* claim of retaliation, she is not entitled to relief because Interstate fired her for a legitimate, nonretaliatory reason—applying automatic gratuity to customer's bills without authority—and that there is no triable issue of fact as to whether that justification was merely pretextual. Doc. 43, 20–21.

Interstate emphasizes the independence and quality of its investigation. Doc. 43, 21. Feldesman questions the quality of the investigation by noting that Interstate relied on opaque spreadsheets and did not produce a report, account for lying, or interview Feldesman, Dennis, Bales, or Riker. Doc. 54, 30.

Interstate also claims that the causal relationship between Feldesman's complaints and her termination is less clear than Feldesman's asserts because other people had complained about Interstate but had not been terminated. Doc. 43, 22. Feldesman distinguishes these examples by asserting that others did not complain to the extent that Feldesman, Dennis, and Bales had complained. Doc. 54, 31.

Finally, Interstate attempts to strengthen the causal connection between Feldesman's alleged violation of the gratuity policy and her firing by claiming that it fired everyone who had violated the policy. Doc. 43, 22. Feldesman challenges this point on the facts, by highlighting evidence that Dubois had also violated this alleged policy without losing her job and by noting that Feldesman, Dennis, and Bales had all complained about sexual harassment and that they had all supported each other's claims. Doc. 54, 23

At base, Feldesman and others claim that, as cocktail servers, they had the authority to add gratuity automatically to customers' bills without their managers' presence and Interstate asserts that they did not have this authority.[6] Because this disputed gratuity practice served as the basis for Interstate's decision to terminate Feldesman and because the Court may not, at this stage, weigh evidence or assess the credibility of witnesses, *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996), there is a triable issue of fact as to whether Interstate's justification was merely pretextual.

## IV.     Conclusion

For the reasons stated above, Defendant's motion for summary judgment is DENIED. The parties are directed to appear for a pretrial conference on Thursday, April 11, 2019, at 12:00 p.m. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 42.

It is SO ORDERED.

Dated: March 31, 2019
         New York, New York

Edgardo Ramos, U.S.D.J.

---

[6] Interstate claims that Feldesman has not provided admissible evidence of her authority to apply the automatic gratuity. Doc. 57, 9. This argument does not accurately reflect the record. In the first place, Feldesman's testimony that she had such authority is admissible evidence. Moreover, as explained above, Dennis testified that Riker "had made [the gratuity button] available to us so that we can use it in his presence—or in his absence" and that she remembered one instance in which Feldesman used it in his presence without repercussion. Doc. 48-2, 48. Furthermore, in their affidavits, Dooreck and Rubino swore that the cocktail servers were authorized to apply the automatic gratuity to customers' bills. Docs. 49, 51.